Filed 4/10/14  P. v. Rios CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br>v.<br><br>ARMANDO DAVID RIOS,<br><br>Defendant and Appellant. | F065166<br><br>(Super. Ct. No. VCF233458)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Woodrow Edgar Nichols, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Armando David Rios of grand theft (Pen. Code,[1] § 487, subd. (a)) and the trial court found defendant committed the offense while released from custody on bail or on his own recognizance in another felony case (§ 12022.1).  On appeal, defendant contends:  (1) the trial judge abused his discretion by failing to recuse himself due to a known conflict of interest and (2) defense counsel rendered prejudicially ineffective assistance at trial.  We affirm.

## *FACTS*

On January 16, 2009, Kerry Whitson, the president and CEO of Golden Maid Packing House (Golden Maid), agreed to purchase 192 bins of cara cara oranges from defendant.  Whitson gave defendant a check for $41,280, payable to defendant's company, Bella Ranches, Inc. (Bella Ranches), for the purchase of the oranges.  The check was deposited into Bella Ranches' Citibank business account the same day.  Defendant never delivered the cara cara oranges to Golden Maid or returned the $41,280 payment, resulting in the current grand theft charge.

The prosecution's primary theory at trial was that defendant committed theft by false pretenses by misrepresenting to Whitson that he had acquired the right to pick and sell the cara cara oranges located in a field owned by grower Drew Turner, when, in fact, Turner did not know who defendant was or have any deal to sell the oranges to him.  Turner's brother, Ronald, another grower of cara cara oranges, was also unfamiliar with defendant.

According to Whitson's testimony, defendant told Whitson that he "represented a grower who wanted to sell the cara caras upfront."  Defendant said the check for the purchase of the cara caras needed to go through him; Golden Maid could not write the check directly to the grower.  Defendant initially would not say who the grower was, but this was not uncommon and made no difference to Golden Maid, so long as defendant

---

[1]    Further statutory references are to the Penal Code unless otherwise specified.

2

"knew that he had the authority to harvest and to control that fruit and he knew that he had crews in the area and could pick the fruit the next day." Whitson explained the cara cara oranges needed to be picked that weekend so Golden Maid could begin packing the fruit on Monday to sell to Costco, which at that time was in the market for the specialty oranges. Defendant assured Whitson he had access to the fruit, the grower had given him the authority to harvest it, that he (defendant) had crews in the area that would start picking the next day and they would deliver the fruit on Sunday.

Before agreeing to purchase the cara cara oranges from defendant, Whitson sent his field coordinator, Bruce Akin, to inspect the cara cara field to make sure the fruit was of good quality and ready to be picked that weekend. When Akin met defendant in the field, defendant was accompanied by someone who identified himself as defendant's brother. Akin thought he recognized the field as belonging to Ron Turner and asked defendant about this. Defendant replied that the field belonged to Ron's brother, Drew. After Akin provided Whitson with a positive report about his inspection of the cara cara field, Whitson agreed to purchase the oranges and gave defendant the check for $41,280.

On January 17, 2009, Whitson sent Akin to the cara cara field to see how the picking was going. After finding no crews in the field, they started making phone calls to defendant. Defendant said there was a mix-up and his crew was not available that day but not to worry about it, they would start picking on Sunday. When no crews appeared on Sunday, defendant said there was a problem but not to worry, they would be there on Monday. According to Akin, there were no problems with the weather on the days when defendant failed to show up to pick the cara cara oranges.

After no one showed up on Monday, Whitson continued calling defendant. Whitson recounted: "At that point[, defendant] started telling me so many different stories that things got a little bit testy because all of a sudden I started hearing stories of there's a third party. The grower won't release the fruit. The grower has changed his

3

mind. There's another party that's offered more money." Whitson then told defendant not to worry about it and just to return the money. For several weeks, Whitson tried unsuccessfully to get defendant to return the money.

Whitson eventually contacted the sheriff's department and a criminal investigation ensued. As part of the investigation, sheriff's detective John Dow had Whitson call defendant on March 4, 2009, and surreptitiously recorded their telephone conversation. During the conversation, Defendant told Whitson his account was "on hold" but "in a week or two everything should be resolved." Defendant insisted he would give back Whitson's money but he just needed a little more time. After this conversation, Whitson did not get his money back.

Whitson testified that the deal he made with defendant for the cara cara oranges on January 16, 2009, was completely separate from a consignment contract he entered with defendant a few weeks earlier on January 7, 2009. Whitson explained that, under the purchase agreement for the cara cara oranges, he would have acquired ownership of the oranges outright along with any potential risks associated with ownership. In contrast, under the terms of the earlier consignment contract, defendant would retain ownership of fruit he brought to Golden Maid to pack. The fruit would then be sold by Trinity Fruit Marketing Company (Trinity) with whom defendant had a separate contract. After the fruit was sold, Trinity would pay Golden Maid for the packing and the "net proceeds" to defendant. Pursuant to the consignment contract, Golden Maid paid Bella Ranches a $17,680 "picking advance" for navel oranges defendant delivered on January 8, 2009.

Rudy Santa Cruz, a bank investigator for Citigroup, conducted an investigation into the activity on the Bella Ranches' business account. The account was opened on December 19, 2008. Defendant and Bruce Martin were the owners and the only two signers on the account. On January 9, 2009, there was a deposit of $17,680 into the account and two withdrawals in the amount of $5,000. On January 16, 2009, there was a

4

deposit for $41,280, and withdrawals of $10,000 and $15,000. On February 3, 2009, there was a deposit of $41,265, a withdrawal of $20,000, and some debit card purchases. On February 4, 2009, there was a withdrawal of $20,000 and an ATM withdrawal for $103.

On February 6, 2009, the $41,265 check deposited on February 3 was returned unpaid. By February 11, 2009, the account was overdrawn by $49,835.26. Consequently, Citibank froze the account. Additional checks were written from the Bella Ranches' account that did not clear; four were $20,000 checks payable to "C-One."

Santa Cruz called and sent a "demand letter" to the account owners notifying them of the problem with the account being overdrawn. Santa Cruz spoke with defendant on the phone on February 18, 2009. Defendant insisted there was no fraud in the checks that had been returned unpaid and promised to take care of the amount that was owed on the account. To Santa Cruz's knowledge, the bank's loss was never resolved.

Employees of Club One Casino testified regarding defendant's transactions at the casino in early February 2009. Defendant wrote a number of $20,000 checks to the casino from his business account. When the casino tried to deposit the checks, the bank would not pay out. According to the casino's general manager, Don Nicholson, defendant owed the casino $100,000 in February 2009. Defendant paid back $20,000, and asked if he could pay the balance of $80,000 off by the end of the month. When defendant failed to pay off the balance, Nicholson contacted him again at the beginning of March 2009. Defendant asked for more time. Nicholson told defendant he could not give him any more time. To Nicholson's knowledge, defendant never repaid the $80,000 to the casino.

### *Evidence Code section 1101, subdivision (b) evidence*

On April 30, 2008, Brian Strack entered into a purchase agreement with defendant, under which he agreed to advance defendant $15,000 for lemons to be

5

delivered to a packinghouse by the next day. The agreement included a provision requiring defendant to return the $15,000 the next day if he failed to deliver the lemons. The day after they entered into the agreement, defendant told Strack he could not get the lemons from the grower and gave Strack a check for $15,000. Strack was unable to cash defendant's check and filed a civil suit against him. Strack won a judgment against defendant in the amount of $15,000 plus interest, but defendant had yet to satisfy the judgment.

In March 2009, defendant and businessman, Mikael Archuleta, a childhood acquaintance of defendant, agreed to work together in connection with a farm labor payroll and accounting company Archuleta was trying to start. Archuleta and defendant both wrote checks to each other. Archuleta asked defendant to wait to cash his check because his account had insufficient funds. Defendant told Archuleta it was okay for him to cash his check. Defendant later called Archuleta and said the deal was not going to go through and asked Archuleta not to deposit the check defendant had given him. Archuleta subsequently learned that defendant had attempted to cash Archuleta's check. The check bounced because there were insufficient funds as Archuleta had warned.

In March 2009, Sanger Police Officer Michael Taylor was contacted by bank investigator Santa Cruz regarding defendant and the overdrawn Bella Ranches' business account. At that time, Citibank's loss was $39,790.21. Officer Taylor noticed that the checks defendant was depositing were all going into the Sanger branch and no holds were being placed on them. Because no holds were being placed on the Sanger deposits, defendant could withdraw money at other Citibank locations. In Officer Taylor's opinion, it was unusual no holds were being placed on deposited checks because the account had just opened in late 2008, and the transactions started in January 2009. Officer Taylor explained that typically new business accounts have extended holds placed on deposits to protect the bank due to the volatile nature of new businesses.

6

In December 2009, Officer Taylor confronted defendant about the activity in the account and asked him why he thought he was being allowed to deposit funds without holds. In response, defendant "basically… said that in business, … you establish certain relationships and trusts with your local bankers and that they float you money and make exceptions on accounts and that's just the way business is done." When asked about the check he received from Archuleta, defendant initially said he did not recall much of the transaction. Later, defendant remembered a meeting he had with Archuleta and the check Archuleta gave him, but defendant did not recall being told Archuleta's account could not cover the check.

### *The defense*

In response to the prosecution's theory that he committed theft by misrepresenting he had acquired the right to sell the cara cara oranges, defendant testified that, before he advised Whitson he had access to the cara cara oranges in Turner's field, he had entered into an agreement with a Crespin Rodriguez and "Jose" to purchase the oranges for $180 per bin. Jose drove defendant to the field and they had "a hand shake on the deal." Defendant did not pick the oranges the next day because it was raining. Defendant was thereafter unable to contact or locate Jose. Defendant eventually learned that the cara cara field had been sold out from under him. Defendant truthfully reported these events to Whitson during their phone call on March 4, 2009, which defendant did not know was being recorded.

Attorney Mario DiSalvo testified that in March 2009, defendant asked his advice on how to deal with an issue regarding Golden Maid. DiSalvo advised defendant that in his opinion it was a "civil matter."

In his testimony, defendant suggested the deal for the cara cara oranges was governed by a grower-packing agreement his company entered into with Golden Maid on December 10, 2008. Defendant characterized the agreement as an "open ended" or

7

"evergreen type of an agreement," which defined the ongoing business relationship between Golden Maid and Bella Ranches, contained specific provisions on how that relationship could be terminated, and spelled out mandatory procedures for resolving disputes. Defendant never received a certified letter from Golden Maid or its representatives stating they were terminating their relationship with Bella Ranches.

Defendant also claimed that at the time Whitson was demanding the return of the $41,280 payment for the cara cara oranges, defendant was still owed money in connection with 272 bins of fruit he delivered to Golden Maid in January 2009, under the grower-packing agreement. Defendant never received a final accounting from Golden Maid regarding that delivery.

On March 18, 2009, defendant received documents from Trinity reflecting that he owed the marketing company $6,000 based on an erroneous accounting of the "packout" from the 272 bins of fruit he delivered to Golden Maid.

When defendant called Trinity to complain about the packout plus their failure to account for any juice, they told him they were getting the numbers from Golden Maid. Defendant called Whitson to try to resolve the issue. Defendant pointed out to Whitson that they both owed each other money and said it was not right that he was not getting credit for the bins he delivered. Whitson replied, "I don't care. I want my money." He then hung up on defendant.

At some point, defendant received a different accounting of the packout which corrected some of the numbers but still did not account for any juice. Defendant estimated he was owed approximately $17,000 for juice alone. Consequently, defendant went to civil attorney John Phillips. At the time of his criminal trial, defendant had a civil suit pending against Golden Maid.

Defendant admittedly suffered a prior criminal conviction for insurance fraud and three prior convictions for nonsufficient funds. However, defendant testified he made "full restitution on those funds."

***DISCUSSION***

## I.    *Claim of Judicial Bias*

Defendant contends the trial court judge abused his discretion by not recusing himself due to bias arising from his prior representation of prosecution witness Drew Turner. The People counter that defendant forfeited his claim by failing to challenge the judge's impartiality below and, in any event, the judge properly disclosed all relevant facts to the parties and defendant cannot meet his burden of showing prejudice. We conclude defendant's claim of judicial bias is both forfeited and without merit.

During the preliminary hearing, the trial court judge disclosed that "when I was a lawyer, I represented Drew Turner."[2] The judge then added, "I don't believe it will have any impact on my feelings here." In response, the prosecutor "waive[ed] any objection at this time." Defendant's privately retained counsel did not respond to the judge's disclosure at the preliminary hearing or seek to disqualify the judge at any time during the subsequent proceedings.

"'If a judge refuses or fails to disqualify herself, a party may seek the judge's disqualification. The party must do so, however, "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (Code Civ. Proc., § 170.3, subd. (c)(1).)'" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111 [quoting *People v. Scott* (1997) 15 Cal.4th 1188, 1207].) As in *Guerra* and *Scott*, defendant's counsel was aware of all the facts that defendant cites on appeal in support of his claim that the trial court judge was biased. Nevertheless, counsel did not claim the judge

---

**2**    During a later hearing on defendant's new trial motion, the trial court judge noted he represented Turner in a DUI case 15 years earlier but maintained it was "inconsequential" to him and "really made no difference in my mind about any aspect of this trial."

9

should recuse himself. "'It is too late to raise the issue for the first time on appeal.'" (*People v. Guerra*, *supra*, at p. 1111.)

Even assuming defendant preserved his claim of judicial bias, we would reject it on the merits because none of the judge's comments or rulings was indicative of bias or prejudice. Defendant's claim rests chiefly on comments the judge made in denying defendant's motion for acquittal (§ 1118.1), which he made at the close of the prosecution's case-in-chief on the ground the prosecution had failed to prove he had the requisite intent to steal. In denying the motion, the judge commented:

> "The key thing is there is the fact that Drew Turner who owned the field had indicated he never met the defendant. Didn't know who he was so the defendant's representation that he could pick those oranges for $40,000 is enough for me to send this case to the jury."[3]

Defendant now asserts the judge "clearly manifested" judicial bias in denying his motion for acquittal based on Turner's testimony because, according to defendant, "Tuner's testimony was not crucial to the case since he admitted that Jose was his middle man." Defendant further asserts the judge's partiality was "manifested by his unwillingness to accept the matter as a squabble among merchants rather than as a case of grand theft." Defendant's assertions fail to establish judicial bias.

As a preliminary matter, we summarily reject any of defendant's arguments resting on his unfounded claim that Turner's testimony established that Turner authorized Jose to coordinate the sale of the cara cara oranges at issue in this case. Contrary to

---

**3**    At the later hearing on defendant's new trial motion, the judge provided the following reflections on its earlier ruling denying defendant's acquittal motion: "[A]fter reading your [new trial] motion yesterday I thought to myself well his brother Ron testified to essentially the same thing. I may have used Drew's name when I denied the [section] 1118 only because I was more familiar with it but his brother Ron testified to a lot of the same facts. Didn't know the defendant. Never contracted with him. He was the co-owner of the cara cara oranges also. And in my mind it had absolutely no effect on my decision and I think a hundred judges if presented with that same [section] 1118 motion, a hundred judges would have made the same ruling I made so that aspect of it is, is not something that's significant."

10

defendant's assertions, Turner never testified that Jose—with whom defendant purportedly made a deal to purchase the cara cara oranges before he approached Whitson—was acting as Turner's "middle man" or that he gave Jose "the authority to broker the fruit." It is unclear how defendant arrived at this interpretation of Turner's testimony; it finds no support in the reporter's transcript references he has provided.

Instead, Turner testified that Jose was "just a guy" with whom he had some prior business dealings and that Jose had been "a potential buyer" of the cara cara oranges. At some unspecified point in 2009, Turner talked to Jose about purchasing the oranges, but "[n]o deals were made." When asked if Jose was his representative at all, Turner testified: "*No.* Other than he just came and, you know, looked at the fruit and made deals with him." (Italics added.) Turner's testimony does not support the inference that Turner gave Jose the authority to sell the cara cara oranges on Turner's behalf and we therefore reject all of defendant's claims to the extent they are based on such inference. We also reject the remainder of defendant's claim of judicial bias for reasons discussed below.

Both federal and state courts have long held that a defendant has a right to an impartial judge. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309-310; *Gomez v. United States* (1989) 490 U.S. 858, 876; *Gray v. Mississippi* (1987) 481 U.S. 648, 668; *Rose v. Clark* (1986) 478 U.S. 570, 579, fn. 7; *People v. Brown* (1993) 6 Cal.4th 322, 332.) However, the United States Supreme Court has held:

> "First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. [Citation.] In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis

11

for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." (*Liteky v. United States* (1994) 510 U.S. 540, 555.)

Contrary to defendant's assertion, the trial court judge's comments in denying his acquittal motion do not reflect judicial bias. The opinion the judge expressed was based on facts introduced by the prosecution. Turner's testimony that he did not know defendant was directly relevant to the prosecution's theory that defendant committed theft by false pretenses by misrepresenting to Whitson and Akin that he was acting as Turner's representative and had acquired the right to sell the cara cara oranges in Turner's field.[4] Moreover, none of the trial judge's comments display any favoritism or antagonism that would make a fair judgment impossible.

Because the record fails to demonstrate any prejudice, we also reject defendant's related claim that his trial counsel was ineffective for failing to make a motion to disqualify the trial court judge on the ground of judicial bias.

## II.    *Ineffective Assistance of Counsel Claim*

Defendant also contends he received ineffective assistance of counsel because his privately retained counsel was unprepared for trial and failed to investigate and subpoena known witnesses whose testimony was needed to corroborate defendant's testimony. We conclude that defendant has failed to meet the heavy burden of establishing ineffective assistance of counsel.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to

---

[4]    As the jury was instructed, defendant was "prosecuted for theft under two theories:  theft by embezzlement and theft by false pretense." (CALJIC No. 1861.)

12

be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) This is a "'high bar,'" and surmounting it is not easy. (*Harrington v. Richter* (2011) 562 U.S. ___ [131 S.Ct. 770, 788].) The defendant must prove prejudice "as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937 (*Williams*).)

In his ineffective assistance of counsel claim on appeal, defendant reprises some of the arguments he made in support of his motion for a new trial, which the trial court denied following a hearing in June 2012. One of those arguments was that counsel was ineffective for failing to locate and subpoena witnesses, particularly Jose Casas and Crespin Rodriguez, to corroborate defendant's testimony regarding his purported deal with Jose[5] to purchase the cara caras in Turner's field before defendant offered to sell them to Whitson.

One of the declarations defendant submitted in support of his new trial motion was that of Rodolfo Gonzalez. According to the declaration, during the period of December 2008 and January 2009, Gonzalez was part owner of Canelo's Trucking and Produce, and Jose was his business partner. Gonzalez and Jose had past business dealings with Ronald and Drew Turner regarding the sale of their produce, and in January 2009, Gonzalez and Jose "both had authority to negotiate … Drew Turner's cara cara oranges." In January 2009, Gonzalez was present at a meeting in Turner's cara cara field, during which Jose showed the fruit to defendant, Bruce Martin, and Crespin Rodriguez. Although Gonzalez

---

**5** For consistency's sake, we resume referring to Jose by his first name, which is how witnesses referred to him during the trial.

13

did not enter a deal to sell the cara cara oranges to defendant, Gonzalez declared, "my business partner [Jose] did so behind my back with Crespin Rodriguez." Consequently, Gonzalez ceased doing business with Jose.

Even assuming counsel's performance was deficient, defendant's ineffective assistance claim fails because he cannot show resulting prejudice. Contrary to defendant's suggestion, Gonzalez's declaration fails to establish the nonsubpoenaed witnesses would have corroborated defendant's claim that he had a deal with Jose to purchase the cara cara oranges before he offered to sell them to Whitson; thereby, in defendant's words, "establishing the lack of fraud at the time [defendant] received the check from Golden Maid."

One major problem with Gonzalez's declaration is its lack of any specific date references. Under the theory defendant posits, the existence of a deal with Jose and Rodriguez to purchase the cara cara oranges in Turner's field would only be relevant to show the absence of fraud if the deal occurred prior to the time on January 16, 2009, when defendant accepted Whitson's check. However, Gonzalez's declaration simply refers to a meeting and deal which took place at some unspecified point in January 2009. It is entirely speculative whether any of the parties mentioned would corroborate defendant's testimony that the meeting and deal occurred before he entered the purchase agreement with Whitson for the cara cara oranges. Furthermore, as the People point out, Gonzalez's statement that Jose and Rodriguez made a deal to sell the oranges to defendant lacks foundation because Gonzalez stated they made this deal behind his back, implying the deal was initially made without his knowledge while failing to explain how or when he became aware of the deal.

Moreover, defendant's own evidence undermines his claim of prejudice by suggesting Jose would not have provided corroborating testimony at defendant's trial even if defendant's trial counsel had made a more concerted effort to locate and subpoena

14

the witness.  In the declaration defendant submitted in support of his new trial motion, defendant's trial counsel averred, "It was only after trial that we learned that '*Jose*' *had been actively avoiding detection and service* as he had immigration and deportation issues and had been advised by some counsel to avoid service."  (Italics added.)  Similarly, Gonzalez declared it was his "understanding that *Jose … is avoiding [defendant] and his representatives* and is being uncooperative and is *unwilling to testify* regarding those events."  (Italics added.)  Under the circumstances reflected in the record, defendant has not proved as a "'demonstrative reality'" that the outcome of the trial would have been different had his trial counsel subpoenaed the witnesses he claims were essential to corroborate his defense.  (*Williams*, *supra*, 44 Cal.3d at p. 937.)  He therefore has failed to meet his burden of proving ineffective assistance of counsel.

We reach the same conclusion with respect to defendant's more general claim that he received ineffective assistance because his trial counsel was unprepared for trial. Defendant erroneously asserts that his trial counsel's declaration in this regard meets both prongs of the test for ineffectiveness because it shows "[counsel] was totally unprepared for trial, having spent all of his time between the preliminary hearing and the trial preparing for other cases."  Counsel's declaration does not support this assertion. Counsel made no statements to the effect he had done nothing to prepare for defendant's case between time of the preliminary hearing in late 2009 and the start of trial in late August 2011.  Instead, counsel declared that "[o]n the Friday before [defendant's] trial I explained that I was not ready" because "I spent the *weekend*" preparing for another criminal case in San Jose.  (Italics added.)  "By doing this," counsel continued, "I was unable to prepare for [defendant's] trial because I was certain that I was to commence Jury Trial on the San Jose criminal case."  Neither counsel's declaration nor the record before us supports defendant's claim that his trial counsel spent *all* his time between the preliminary hearing and trial preparing other cases.

15

The only other specific example of counsel's unpreparedness that defendant offers in the argument section of his opening brief is the failure to investigate and subpoena the witnesses already discussed to corroborate his testimony at trial. However, in his reply brief, defendant adds that counsel was unprepared because he failed to investigate and subpoena witnesses "to rebut the other bad acts evidence" and failed "to provide any evidence of the law of merchants as it is applied in disputes." "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) In any event, defendant has failed to establish that it is reasonably probable he would have received a more favorable result absent counsel's alleged omissions. Consequently, his ineffective assistance of counsel claim fails.

## ***DISPOSITION***

The judgment is affirmed.


_____

HILL, P. J.

WE CONCUR:


_____

LEVY, J.


_____

CORNELL, J.


16